**NATIONAL ELECTRIC PRODUCTS CO. v. CIRCLE FLEXIBLE CONDUIT CO.,**
Inc., et al.
No. 49.

Circuit Court of Appeals, Second Circuit.
Nov. 9, 1936.

Kenyon & Kenyon, of New York City (Theodore S. Kenyon, Frederick Bachman, and W. Houston Kenyon, Jr., all of New York City, of counsel), for appellants.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds and John Hoxie, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is the usual suit in equity upon a patent for coating electric wires; the claims are for the process and the product. For many years before March 22, 1927, when Frederickson, the patentee, filed his application, it had been the practice to cover copper wire with a coating of rubber insulation, and to cover this insulation with a braided jacket to protect it from abrasion. The result was inacceptable for some uses; the rubber would not resist moisture; the coating would support fire after it was once ignited; the jacket was difficult to pull through the conduits in which the wire was installed. Each of these defects the art had corrected separately; it is the pith of the plaintiff's position that it had never combined the corrective of all three at once. As to making the wires waterproof, the record is unambiguous; it had been done for many years with various kinds of impermeable saturants. Again, jackets so coated and made water-proof, had been finished with an outer coat of smooth wax, so that they could be readily pulled through conduits with greatly reduced friction. This under coat was at times made of asphalt and wax, and the finish, of wax alone, put on at temperatures ranging from 180 to 210 degrees Fahrenheit. But this, though satisfactory in keeping out moisture with its attendant danger of short-circuiting, failed to give protection against fire; the wire would burn freely, once lighted, and this was a substantial danger; many fires resulted from it. The industry, recognizing this defect, had provided against it also; thus in 1913 a patent appeared to one, Trotter (No. 1,067,951), for a plastic coating of stearin pitch and manganese oxid, designed to make the wire at once water, and fire, proof—"fire-proof," that is, as we shall use the words, but more strictly "flame-repellant." This wire was then covered with mica dust to make it easier to handle, for the pitch was sticky; but it had no wax coat. The art was also familiar with a braided jacket, through which wires might be drawn, called "loom," which was sold in large quantities. This was first impregnated with a saturant to keep out water, a mixture of wax and asphalt; next, it was covered with a coat of stearin pitch as fire-proofing; last, mica dust was strewn over it to make the surface less sticky. The mica finish did not answer, however, because much of the product was returned; when laid upon itself in coils, the fire-proof coating would peel off. A wax coat or finish had also been applied to a fire-proofing coat. Abbott in 1923 filed an application, patented in 1924 (No. 1,520,680), disclosing three coats with a wax (stearine) finish. The first coat was of zinc oxide and silicate of soda, which was both flame and moisture resistant, but more the first than the second; the second was of barium sulphate and china wood oil, more moisture than fire proof; the third was a repetition of the first coat and upon this the wax finish might be laid as a fourth coat. The first and third coat was, however, not only not moisture proof, though Abbott so supposed, but the silicate of soda actually would dissolve out if there was no wax finish; and the wire became inflammable if the wax was thick enough to keep out moisture. Abbott's invention was, however, also applicable to single wires as well as twin, and when so applied the wax finish would cover the second coat, barium sulphate and china wood oil; and this, while it was not the fire proof coat which Abbott had in mind, was in fact a fire repellant, yet even then it would not be a good combination for the purpose, and besides the wax was not laid upon a substance which its heat might so soften as to fuse the two layers. That was Frederickson's "problem." Abbott cannot therefore be regarded as an anticipation.

So matters stood when in September, 1926, the New York Board of Fire Underwriters ordered all wires to be bound with asbestos tape for some distance back from the ends that came out from the "pull-boxes"—those boxes which receive the wires from the conduits. It is here that fire is most likely to start, but such

taping is laborious and expensive. At about the same time the Otis Elevator Company so changed its elevator control panel that the heating of wires when run close together, which had been trouble-some before, became an acute danger; that company began to look for a fire-proof wire. Frederickson had perhaps completed his invention in January, 1926; at least so he swore, and the exact time is not important anyway. Although claim seven introduces water-proofing as a step in his process, it is clear that he did not suppose that this really added anything to it; and if he had, it would have been an untenable position, taken either as to conception or as to execution. He did indeed describe the water-proofing coat (page two, lines 93–130), but it was not new, nor was there anything new in adding the fire-proofing coat, or in the composition of that coat itself. All this was in the "loom," with which indeed he began as his departure. What he did claim was the addition of the wax finish in such a way that it should not penetrate the underlying fire-proof coat, and, being itself inflammable, weaken the fire-proofing. That this was his invention appears not only in all the process claims, but repeatedly throughout the specifications. It was not easy, however, to get the industry to accept what he had done, even after he had enlisted the plaintiff's sales manager, Bennett, who professed to see in it a long desired satisfaction. Even though the wire ends had by that time to be wrapped with asbestos tape, the contractors appear to have preferred to do so rather than to exert the necessary pressure on the manufacturers. The failure of the manufacturers themselves to adopt the new wire cannot have been because they were sceptical as to its performance; any such doubts could be answered in a few months. Business is indeed conservative but it seems impossible that the lag should have been so long if there had been much real desire for Frederickson's wire. At any rate it was not until 1933 when the New York building code made it obligatory, that the invention went into widespread use. The plaintiff, who had bought it, had meanwhile offered licenses to the whole industry, including not only this patent but a number of others, and, perhaps because the terms are not exacting, substantially everyone assented and became a licensee. The defendant is one of the few who preferred to contest.

It manufactures a wire in which the rubber insulation is first coated with a water-proofing, composed of a combination of stearin pitch, asphalt, and wax, put on by running the wire through a hot bath of the saturant at about 375 degrees F. A thousand feet of wire takes up one and a quarter pounds of this coat, which is at once dusted with a mixture of sodium bicarbonate and powdered mica, seven parts to three, of which the first coat takes up three quarters of a pound to a thousand feet. After cooling the wire is then passed through a bath at about 360 degrees F. of a mixture of two kinds of blown asphalt and 10% of wax, taking up half a pound of this to a thousand feet. These two layers compose the fire-proofing. The wax coat is then laid on, likewise made of wax and asphalt, with a melting point of about 215 degrees F., one half a pound to a thousand feet; this gives that sleek smooth finish which enables the wire to be readily drawn through conduits. The result is a product which will not support combustion, due chiefly to the presence of the mica and sodium bicarbonate, though the layer of asphalts and wax which mixes with the filler is itself also a flame resistant to some extent. Asphalt is one of the substances mentioned in the patent as an equivalent for stearin pitch (page 5, lines 4–15), and mineral fillers are also included. The plaintiff argues that it should not be possible to evade the claims by dividing the fire proofing into two steps, first adding the filler and then the binder. Indubitably the two become a fire-proof coat; indubitably the asphalt is a sticky surface not fit for drawing through conduits, scarcely distinguishable to the eye from stearin pitch. Similarly it urges that the wax finishing coat is within the claims, and that it is of no consequence that the under coat softens, as in fact it does, at a somewhat lower temperature than the melting point of the wax. The wax coat is put on at about the same temperature at which the art had always coated wire with wax, 215 degrees; its melting point is a little below this. The melting point of the fire-proof coat is above it, from 250 degrees to 275 degrees. The plaintiff insists that we should read the patent in the light of its purposes, and that, if so, the real question is whether during the process the wax penetrates into the fire-proof coat so as to affect its resistance. While there is no direct proof upon that

issue and the fire-proof coat itself has ten per cent. of wax in it, experiment shows that this does not affect its incombustibility; and while we cannot be sure that none of the finishing coat penetrates, not enough can do so to injure appreciably the fire-proof coat; else the results would not be so good as they are. There is no absolute line of melting; such substances change imperceptibly from solids to liquids, and the question is whether in practice the wax enters "to any substantial extent" (page 4, lines 97, 98). Experience shows that the defendant's wire answers such a test. This is the plaintiff's argument upon infringement, and we agree that it is plausible. We do not, however, find it necessary to pass on the issue, because we think the claims invalid.

It is true that the art had felt the need of a wire which should not be inflammable; but Trotter had supplied one, and "loom" was concededly so close to wire as to be indistinguishable for our purposes. Again, as we have shown, Abbott disclosed a wire in which a somewhat fireproof coat was covered with wax; though, as we have said, it was probably not very practical, it certainly contained the idea, the bare conception. Indeed, even without Abbott we should hardly be willing to hold that there could be any invention in the mere idea of coating "loom" with wax. If what Frederickson did—and we agree that it was a new step—was invention at all, it was because it took uncommon talent to put that idea into practice. Yet drawing the wire through a wax bath was standard practice, and so was the temperature selected. Moreover, if Frederickson had merely taken the fire proof coat which he was in fact using and treated it as the art had treated the water proof coat, he would have produced at once what he produced in the end. His difficulties, and the "problem" which he "solved," arose from his original erroneous suppositions. He thought that he must heat the wax much higher than the art had done, and he almost vaporized it in so doing. Having got it above the melting point of the stearin pitch coat it probably fused with it and spoiled it. It was only by accident, he says, that he learned that he had inverted the proper relation, and should have kept the wax below the melting point of the pitch; it is this which he presents to us as the cue for which the art had waited many years. In support of this position he invokes the history of the art.

No doubt it is true that when history speaks, it is the best guide upon the issue of invention; but it is too often an equivocator, like other oracles, and this is an instance. The fact that something has been needed for long is indeed some basis for inferring that men have tried to supply it; but it may be a very shaky one. When the need is not urgent, the industry often accepts matters as they are and does not disturb its routine. We have already said that the art showed a strange sluggishness in exploiting this invention; even after a substantial pressure had been applied to it in September, 1926, it took much energetic propaganda to get it to move at all. We do not count it that several underwriters had earlier urged the manufacturers to produce a sleek smooth fire proof wire, and had been answered that it was impossible to make one. Manufacturers like other men are not easily stirred from their habit; it costs money and effort to remodel processes, and until they are forced to it, inertia will usually turn the scale. There is not a syllable that anyone had in fact ever tried to wax a fire-proof coat, e. g., Trotter's or the "loom"; and when the manufacturers answered as they did, it is entirely reasonable to suppose that they had never put the matter up to their laboratories. It is a curious accident that as soon as the underwriters really applied a sanction, the wire appeared, and it seems more than an accident that even then, as we have seen, it made its way slowly. For these reasons we think that it would be necessary to interpolate much that does not exist into the history of this art before we should infer that others had unsuccessfully addressed themselves to this problem. We cannot therefore escape undertaking to estimate its difficulties for ourselves, uninfluenced by any supposititious lessons from the past.

Once we do so, the supposed intricacies disappear. We are not disposed to accept as inevitable—or, to be frank, as even reasonable—Frederickson's original approach: If we assume that he had learned that it was the mixture of wax with the fire proof coat which injured the coat, surely the remedy was apparent; do not let them mix. We cannot force ourselves to believe that it was beyond ordinary re-

sourcefulness to keep the under coat at a temperature below its melting point, when that was the end sought; we cannot see why anyone should have thought of any other way. To dress this into a discovery important enough to monopolize a whole industry appears to us extravagant. It might indeed have been troublesome to discover fire proof coats with a high enough melting point, but Frederickson did not lay his invention on that; apparently such compounds abound and are readily enough discoverable once one knows what one wants. Nor does it seem to us that the patent can rest upon the discovery that what injured the product was the fusing of the wax with the under coat; nothing but the wax could conceivably affect it. True, an experimenter might conclude that there was no solution, because the wax alone would support flame even though the under coat remained as resistant as before. That might have induced him to abandon the whole endeavor, but persistence in experimentation is not a substitute for talent. Had he proceeded at all, he must have tried to keep the layers separate. It appears to us therefore that the case is one where the obstacles yielded to the first experimenter shown to have really worked for the specific end, and that the end itself was quite within the compass of commonplace powers. We hold the claims invalid for lack of invention.

Decree reversed; bill dismissed.